BYE, Circuit Judge.
Steven VandeBrake pleaded guilty to two counts of price fixing and one count of bid rigging in violation of 15 U.S.C. § 1. The guilty plea was pursuant to a nonbinding plea agreement he reached with the government after the district court[1] indicated it would not accept a binding plea agreement calling for a sentence of nineteen months. The district court sentenced VandeBrake to forty-eight months of imprisonment followed by three years of supervised release, and imposed a fine of $829,715.85. In selecting a sentence of forty-eight months, the district court varied upward from the advisory guidelines range based primarily upon VandeBrake’s lack of remorse and the court’s policy disagreement with United States Sentencing Guidelines Manual (U.S.S.G.) § 2R1.1. VandeBrake appeals his sentence contend *1032 ing the district court abused its discretion by not accepting the binding plea agreement. He also contends the sentence of forty-eight months, as well as the amount of the fine, are substantively unreasonable. We affirm.
I
In 1994, VandeBrake took over his family’s concrete business in Orange City, Iowa. Fourteen years later VandeBrake sold the family business to Grupo Cementos de Chihuahua (GCC), a Mexico-based corporation which operates close to two dozen cement plants in Iowa. GCC formed GCC Alliance Concrete (Alliance), and VandeBrake thereafter worked as a sales manager for the new company. In March 2009, the United States Department of Justice (DOJ) began investigating VandeBrake for his involvement in a bid-rigging conspiracy arising from the sale of concrete products in northern Iowa. The investigation began after one of Alliance’s competitors reported the bid-rigging conspiracy to the DOJ under the Antitrust Division’s Leniency Program.[2]
The DOJ’s investigation confirmed the existence of a bid-rigging conspiracy between VandeBrake’s company, Alliance, and two of its competitors, as well as a price-fixing scheme between Alliance and a third competitor. As a result of the investigation, the government filed a criminal information against VandeBrake charging him with three antitrust violations of 15 U.S.C. § 1, two counts for bid rigging and one count for price fixing. Through his counsel, VandeBrake engaged in extensive negotiations with the DOJ’s Antitrust Division, ultimately reaching an agreement whereby the parties would ask the district court to accept a binding plea agreement under Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure. The binding agreement, if accepted by the district court, called for VandeBrake to serve a sentence of nineteen months and pay a fine of $100,000 for his role in the bid-rigging and price-fixing conspiracies.
Shortly after VandeBrake entered guilty pleas to all three counts before a magistrate judge, the district court entered an order announcing it would not accept the binding plea agreement. The district court scheduled a hearing under Rule 11(c)(5) to discuss the matter. At the hearing, the district court disclosed the reasons why it was not accepting the binding plea agreement, which included: 1) the leniency of the sentence in light of VandeBrake’s conduct; 2) a policy disagreement with the antitrust guidelines; 3) the presence of codefendants and the need to give fair sentences to each defendant after reviewing all of the applicable presentence investigation reports (PSRs), which the district court had not yet done; 4) the DOJ attorney’s relative lack of experience when compared to the district court’s own sentencing experience; and 5) a reluctance to surrender the district court’s sentencing discretion in light of the other factors just mentioned.
Ultimately, however, the district court did not reject the binding plea agreement, but gave VandeBrake the option of going forward with the sentencing hearing, after which the district court would decide whether to accept or reject the binding plea agreement. See Fed.R.Crim.P. 11(c)(3)(A) (indicating a district court “may accept [a binding] agreement, reject it, or defer a decision until the court has reviewed the presentence report”). Speaking with candor, the district court represented “there’s probably a less than 10 *1033 percent chance that I would accept the plea” if the parties opted to go forward with the sentencing hearing first. The district court recessed briefly to allow the parties to discuss their options. After the recess, VandeBrake indicated he still wanted to plead guilty, but would plead to a non-binding plea agreement under Rule 11(c)(1)(B) rather than a binding plea agreement under Rule 11(c)(1)(C). The district court accepted VandeBrake’s guilty plea pursuant to the non-binding plea agreement.
Prior to sentencing, the district court ordered a PSR prepared. The PSR discussed, among other things, the length and scope of the concrete bid-rigging and price-fixing conspiracies. The first bid-rigging conspiracy took place between Alliance and one of its competitors from June 2008 through March 2009. The second bid-rigging conspiracy took place between Alliance and a second competitor from January 2008 through August 2009. The price-fixing conspiracy took place between Alliance and a third competitor from January 2006 through August 2009. The PSR calculated the volume of commerce affected by each conspiracy to be $591,000, $95,000, and $4,845,439.61, respectively, for a total of $5,531,439.61.[3] Using the antitrust guideline set forth in U.S.S.G. § 2R1.1, which includes adjustments for the volume of commerce attributable to a defendant, the PSR calculated a final offense level of sixteen. The advisory guidelines range was 21-27 months.
The district court conducted a three-day sentencing hearing for VandeBrake and one of his codefendants. Following the sentencing hearing, the district court issued a detailed memorandum indicating it was varying upward from the advisory guidelines range by imposing a sentence of forty-eight months. The two primary reasons given by the district court for the variance were a policy disagreement with the antitrust guidelines and VandeBrake’s lack of remorse for his crimes. The district court’s policy disagreement focused on the Sentencing Commission’s choice to increase the offense levels for antitrust violations less rapidly than the offense levels for fraud violations despite the comparable societal harm targeted by both the fraud and antitrust guidelines. The district court also indicated why it believed the Commission’s explanation for the disparity did not apply in VandeBrake’s situation.
The court further concludes that because of a flaw in U.S.S.G. § 2Rl.l(b)(2), application of that section fails to provide a just and reasoned sentencing range given the facts of VandeBrake’s case. The Sentencing Commission has explained that the offense levels for antitrust violations were increased in § 2R1.1 “to make them more comparable to the offense levels for fraud with similar amounts of loss.” U.S.S.G. app. C, amend. 377. The base offense level for antitrust violations begins at a higher level than the base offense level for fraud violations “in order to reflect the serious nature of and the difficulty of detecting such violations.” Id. However, the base offense level for antitrust violations then increases less rapidly than the offense level for fraud violations “in part, because, on the average, the level of mark up from an antitrust violation may tend to decline with the volume of commerce involved.” Id. This assumption is incorrect in this case, particularly with respect to VandeBrake’s price-fixing of concrete sales through [Alliance’s] *1034 price list. [Alliance] would establish a price list in January for a given year and then stick to that price list for the remainder of the year. Because [Alliance’s] price list was based on a per cubic yard price, [Alliance’s] price for its concrete did not decrease with volume. Thus, the level of mark up here for VandeBrake’s price-fixing violations did not decline with the volume of commerce involved. Consequently, [Alliance’s] unit cost of production should have decreased as production increased, thereby increasing the profits to be drawn from VandeBrake’s antitrust activities and increasing the losses to his victims. Therefore, there is no basis in this case for the base offense level for VandeBrake’s antitrust violations to increase less rapidly than the offense level for comparative fraud violations. The court notes that the volume of commerce in this case, as agreed by the parties, is $5,666,439. The commentary to § 2R1.1 indicates that:
It is estimated that the average gain from price-fixing is 10 percent of the selling price. The loss from price-fixing exceeds the gain because, among other things, injury is inflicted upon consumers who are unable or for other reasons do not buy the product at the higher prices.
U.S.S.G. § 2R1.1 cmt. 3. Ten percent of the affected volume of commerce in this case is $566,634. Thus, the estimated loss to VandeBrake’s victims in this ease is more than $566,634. Under such circumstances, the fraud guideline § 2Bl.l(b)(l)(H) directs a fourteen level increase because the resulting loss in this case is more than $400,000 but less than $1,000,000. This is substantially more than the meager two point increase called for by § 2R1.1(b)(2)(A) and leads the court to find that application of that section fails to provide a just and reasoned sentencing range given the facts here. Accordingly, the court finds that the “nature and circumstances of the offense,” 18 U.S.C. [§ ] 3553(a)(1), “the need for the sentence imposed-to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense,” 18 U.S.C. § 3553(a)(2)(A), each justify the need for substantial punishment above the guideline sentence and warrants a variance of VandeBrake’s sentence above the applicable guideline sentence.
United States v. VandeBrake, 771 F.Supp.2d 961, 1004-05 (N.D.Iowa 2011) (internal footnote omitted).
The district court also justified its variance when taking into account “the history and characteristics of the defendant” pursuant to 18 U.S.C. § 3553(a)(1), focusing on VandeBrake’s lack of remorse.
What the court finds most disquieting about VandeBrake’s history and characteristics is that VandeBrake was already wealthy when he embarked on and engaged in the charged conspiracies. VandeBrake can make no claim to be a latter-day Jean Valjean, the unemployed protagonist in Victor Hugo’s Les Miserables who was imprisoned for stealing a loaf of bread to feed his widowed sister’s seven children. As this court recently recognized, “[a] crime of fraud by one who already has more than enough — and who cannot argue that he suffered a deprived or abusive childhood or the compulsion of an expensive addiction — is simply a crime of greed.” United States v. Miell, 744 F.Supp.2d 904, 955 (N.D.Iowa 2010). Nearly as disturbing is the fact that VandeBrake fails to believe that he was motivated by greed. Instead, VandeBrake continues to justify and rationalize his conduct. He excuses his criminal conduct by reasoning that he gave [Alliance’s] customers a “great product for a good price.” Sentencing Tr., Vol. 1 at 251. VandeB *1035 rake’s self-serving rationalizations reflect a total lack of remorse for his criminal conduct in his case. Also, it has not escaped the court’s attention that VandeBrake initiated the conspiracies charged in Counts 1 and 3. Thus, he cannot claim to have been unwittingly-duped into joining and participating in those charged conspiracies. Equally troubling is the fact that VandeBrake is one of the few white collar defendants I have sentenced where the sentencing record is totally devoid of any community work, participation in any service organizations, or charitable giving. There is no record evidence of even a single good deed done by VandeBrake for anyone other than his family. VandeBrake makes a mockery of the adage that “to whom much is given, much is expected.” Thus, the court finds that VandeBrake’s history and characteristics warrant more significant punishment than the advisory guidelines might mete out, despite VandeBrake’s lack of prior criminal history. Instead, these factors warrant a variance of VandeBrake’s sentence above the applicable guideline sentence.
VandeBrake, 771 F.Supp.2d at 1005-08 (internal footnote omitted).
Finally, the district court gave a detailed explanation of the fine amount it chose, considering all the factors listed at 18 U.S.C. § 3572(a)[4] and the Sentencing Commission’s directive that “[t]he amount of the fine should always be sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive.” Id. at 1012 (quoting U.S.S.G. § 5E1.2(d)(2)). The district court determined the antitrust guidelines’ recommended fine range (based on one to five percent of the volume of commerce) was “woefully inadequate” because of the amount of loss involved in VandeBrake’s case. Id. at 1011. The district court justified its upward variance based on the guidelines’ recommendation that an upward departure may be warranted “where two times the amount of loss resulting from the offense exceeds the maximum guideline fine.” Id. at 1012 (citing U.S.S.G. § 5E1.2, cmt. 4). In determining the amount of loss to VandeBrake’s customers, the district court relied upon the Sentencing Commission’s determination that the amount of loss involved in an antitrust violation is greater than ten percent of the volume of commerce involved. Id. (citing U.S.S.G. § 2R1.1 cmt. 3). The district court ultimately chose an amount which represented fifteen percent of the volume of commerce involved in VandeBrake’s case, concluding:
VandeBrake is an extremely wealthy individual, with a net worth over $10,000,000. VandeBrake’s wealth and assets are particularly pertinent to consider in determining the proper amount of his fine because a $829,715.85 fine, while in the abstract is a large sum of money, is quite modest when compared to VandeBrake’s overall wealth. Only by imposing a fine of such a large amount does the fine become sufficiently proportionate to VandeBrake’s wealth to properly reflect the gravity of his offenses. Given VandeBrake’s wealth, the court finds that a $829,715.85 fine is appropriate in order to ensure that it is “sufficient to ensure that the fine, taken together with other sanctions imposed, is punitive.” U.S.S.G. § 5E1.2(d)(2); see United States v. Koestner, 628 F.3d *1036 978, 979 (8th Cir.2010) (affirming the imposition of a $100,000 fine which was $70,000 above the advisory guidelines range where the defendant was a “millionaire” and such a fine was appropriate to ensure that the sentence was punitive to the defendant).
VandeBrake, 771 F.Supp.2d at 1012.
VandeBrake filed a timely appeal. On appeal, he contends the district court abused its discretion by not accepting the binding plea agreement. He also contends the sentence of forty-eight months and fíne of $829,715.85 are substantively unreasonable.
II
VandeBrake contends the district court abused its discretion by not accepting the Rule 11(c)(1)(C) binding plea agreement. The government responds by contending VandeBrake waived this claim when he chose to plead guilty to a nonbinding plea agreement under Rule 11(c)(1)(B). We agree with the government.
We first note the district court did not actually reject the binding plea agreement. The district court has three choices when presented with a binding plea agreement proposed by the parties. It may accept the binding plea agreement, reject it, or defer a decision until after reviewing the presentence report. Fed.R.Crim.P. 11(c)(3)(A). Here the district court chose the third option by deferring its decision. VandeBrake then chose to enter a nonbinding plea agreement with the government. The new plea agreement did not preserve VandeBrake’s right to challenge the district court’s nonacceptance of the binding plea agreement; it was unconditional.
“[A] guilty plea represents a break in the chain of events which has preceded it in the criminal process.” Tollett v. Henderson, 411 U.S. 258, 267, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973). “It is established that an unconditional plea of guilty waives all prior infirmities which neither affect the court’s jurisdiction nor the substantive sufficiency of the indictment.” United States v. Barker, 594 F.2d 709, 710 (8th Cir.1979). The only Rule 11 issues we have considered on appeal following an unconditional guilty plea are those which “call[ ] into question the knowing and voluntary nature of a plea, and thus its validity,” including challenges to the “adequacy of a factual basis” for the plea. United States v. Frook, 616 F.3d 773, 775 (8th Cir.2010). VandeBrake does not claim his decision to enter the non-binding plea agreement was unknowing or involuntary, nor does he challenge the factual basis for the plea. Under these circumstances, we conclude VandeBrake’s unconditional guilty plea waived the right to complain about the district court’s alleged indiscretions with respect to the binding plea agreement. See United States v. Rivera, 209 Fed.Appx. 618, 620-21 (8th Cir.2006) (declining to address a claim that a district court abused its discretion in rejecting a binding plea agreement where the defendant subsequently entered a second plea agreement “made with a full understanding of the possible consequences[,]” concluding the second plea agreement “cured any prejudice possible” from the district court’s rejection of the first agreement); see also United States v. Walker, 927 F.2d 389, 390-91 (8th Cir.1991) (addressing the merits of a claim involving a rejected plea agreement but only because the defendant’s second plea agreement “allowed appellant to enter a conditional guilty plea with leave to pursue this appeal[,]” and nevertheless concluding the defendant’s “subsequent action of entering into a new plea agreement cured any potential prejudice” from the alleged infirmities associated with the first plea proceeding).[5]
*1037 VandeBrake next contends his sentence of forty-eight months and fine of $829,715.85 are substantively unreasonable. We review these claims under a standard akin to an abuse-of-discretion standard, “cognizant that ‘it will be the unusual case when we reverse a district court sentence-whether within, above, or below the applicable Guidelines range-as substantively unreasonable.’ ” United States v. Deegan, 605 F.3d 625, 634 (8th Cir.2010) (quoting United States v. Feemster, 572 F.3d 455, 464 (8th Cir.2009)).
The district court gave two primary reasons for varying upward from the guidelines range: (1) a policy disagreement with the antitrust guidelines, and (2) VandeBrake’s lack of remorse. Both were permissible reasons for varying from the guidelines. See United States v. Battiest, 553 F.3d 1132, 1137 (8th Cir.2009) (noting a policy disagreement may provide a basis for a district court’s variance from the advisory guidelines range) (citing Kimbrough v. United States, 552 U.S. 85, 110—11, 128 S.Ct. 558, 169 L.Ed.2d 481 (2007)); United States v. Hildebrand, 152 F.3d 756, 766 (8th Cir.1998), abrogated on other grounds by Whitfield v. United States, 543 U.S. 209, 212, 125 S.Ct. 687, 160 L.Ed.2d 611 (2005) (recognizing a district court is entitled to consider a defendant’s lack of remorse, among other things, “[i]n selecting a point within the appropriate guideline range, or in deciding whether a departure is warranted”); see also United States v. Chase, 560 F.3d 828, 832 (8th Cir.2009) (explaining that factors which may justify a departure can also be used to justify a variance).
VandeBrake’s primary complaint regarding the substantive unreasonableness of his sentence is that its length equals the longest sentence ever imposed in an antitrust case. He argues the volume of commerce and duration of the conspiracies involved in his case pale in comparison to the only other forty-eight month sentence imposed in an antitrust case. The length of VandeBrake’s sentence, however, results in large part from the district court’s policy disagreement with the antitrust guidelines. The district court believed the antitrust guidelines are too lenient, and consequently gave VandeBrake a more severe sentence than the within-the-guidelines’ sentence VandeBrake cites for comparison purposes. Because the district court varied from the guidelines, VandeBrake’s sentence will necessarily differ when compared to a within-the-guidelines’ sentence. That mere fact does not ipso facto make the sentence substantively unreasonable. See, e.g., Kimbrough, 552 U.S. at 107-08, 128 S.Ct. 558 (rejecting the government’s argument that nonmandatory guidelines would result in defendants with similar conduct receiving “markedly different sentences, depending on nothing more than the particular judge drawn for sentencing” by stating “our opinion in Booker recognized that some departures from uniformity were a necessary cost of the remedy we adopted”).
VandeBrake also claims the district court gave invalid reasons for its policy disagreement with the guidelines. We disagree. The district court gave cogent reasons for its policy disagreement by comparing the antitrust guidelines to the fraud guidelines which attack a similar societal harm. The district court also tied its policy disagreement to the specific facts involved in VandeBrake’s case, noting VandeBrake’s prices for concrete did *1038 not decrease as the volume of sales increased, the primary reason the Sentencing Commission gave for increasing the levels of antitrust violations less drastically than levels of fraud cases depending on the relative amount of loss or volume of commerce involved. VandeBrake contends the district court was mistaken about his prices not decreasing as the volume of the sale increased, contending he gave discounted prices in almost all of his sales. But as the government correctly notes, the benchmark for the discounts was always VandeBrake’s artificially inflated price list. “Thus, whether setting the discounted price per cubic yard at an artificially high level, or the list price from which the standard per cubic yards discounts were given at an artificially high level, VandeBrake was able to ensure that his profits were also standard and artificially high for each ‘type of entity’ he sold his over-priced concrete to.” Appellee’s Br. at 39.
We respectfully disagree with the dissent’s view that the district court’s policy disagreement with antitrust guideline § 2R1.1 turns on some aspect of the guideline which “exemplifies] the Commission’s exercise of its characteristic institutional role” in light of “empirical data and national experience” such that “closer review” of the district court’s decision “may be in order[.]” Kimbrough, 552 U.S. at 109, 128 S.Ct. 558. Indeed, as the dissenting opinion itself demonstrates, the Commission’s revisions to the antitrust guidelines have largely been in response to Congressional acts. See Post at 1035 (“Following Congress’s cue [referring to S.Rep. No. 98-225, at 177, suggesting white collar criminals were too frequently sentenced to probation or short terms of imprisonment] the Commission’s first version of the [antitrust] guidelines increased the mean sentences of white-collar crimes above then-current averages to reduce the disparity between white-collar crimes and other property crimes, such as larceny.”); post at 1045 (indicating the Commission’s 2005 amendment to § 2R1.1 “was in response to Congress’s enactment of the Antitrust Criminal Penalty Enhancement and Reform Act of 2004, which increased from three to ten years the maximum term of imprisonment for antitrust violations under 15 U.S.C. § 1”). Similarly, in Kimbrough, the fact that the Commission merely responded to a Congressional act in adopting the 100:1 powder/crack ratio (i.e., the mandatory minimum sentences set in the 1986 Act) was expressly why the Supreme Court stated the “crack cocaine Guidelines ... present no occasion for elaborative discussion of this [closer review] matter[.]” 552 U.S. at 109, 128 S.Ct. 558.
The dissent’s approach conflicts not only with Kimbrough itself, but with other circuits that have addressed Kimbrough’s suggestion for “closer review” of some district court sentencing decisions. Those circuits have focused on whether the Commission developed a particular guideline “based on research and study rather than reacting to changes adopted or directed by Congress.” United States v. Grober, 624 F.3d 592, 601 (3d Cir.2010); see also United States v. Henderson, 649 F.3d 955, 960, 962 (9th Cir.2011) (concluding “district judges must enjoy the same liberty to depart from [the child pornography Guidelines] based on reasonable policy disagreement as they do from the crack-cocaine Guidelines discussed in Kimbrough” because “[m]ost of the revisions [to § 2G2.2] were Congressionally-mandated and not the result of an empirical study”). In Grober, a district court based its sentencing decision upon a policy disagreement with the child pornography guideline at U.S.S.G. § 2G2.2. After conducting an extensive examination of the development of § 2G2.2, the Third Circuit did not employ Kimbrough’s closer review because “the *1039 Commission did not use an empirical approach to develop § 2G2.2, but instead amended it repeatedly at the direction of Congress[.]” 624 F.3d at 607 (citing United States v. Dorvee, 616 F.3d 174, 186 (2d Cir.2010)). The Third Circuit employed the same abuse-of-discretion/substantive unreasonableness standard we use here and affirmed the district court’s sentence, stating “the Court explained at great length, both at sentencing and in its written opinion, the reasons it was concerned about § 2G2.2 in general and as applied to Grober in particular, and why it selected the sentence it did.” Id. at 601.
Likewise, here the district court not only explained at great length why it was concerned about § 2R1.1 in general, but more importantly, explained how the guideline applied to (or rather, did not adequately account for) VandeBrake’s particular offense conduct. The crux of the district court’s policy disagreement with § 2R1.1 was the Commission’s assumption that the level of mark-up from an antitrust violation may tend to decline with the volume of commerce involved. The district court explained why such an assumption did not apply to VandeBrake, because VandeBrake’s concrete prices did not decrease with volume. Thus, in this case, the only aspect of § 2R1.1 which is relevant when considering the guideline’s development is the volume of commerce gradations set forth therein. Even if that aspect of § 2R1.1 were the product of the Commission’s institutional strengths,[6] we would still employ deferential substantive reasonableness review in this case because the district court’s sentencing decision was “based on the particular facts of an individual case, which is entitled to ‘greatest respect’ because it exemplifies the district court’s institutional strengths.” Post at 1044 (quoting Kimbrough, 552 U.S. at 109, 128 S.Ct. 558).
We also respectfully disagree with the dissent’s view that Kimbrough's, “closer review” language necessarily equates to de novo review, as opposed to still falling somewhere within our well-accepted post-Booker review for substantive reasonableness. The facts and circumstances involved in this case well exemplify that point. Contrary to the dissent’s view, the district court committed no procedural error when it sentenced VandeBrake. The district court properly calculated the advisory guidelines sentencing range at step one of the sentencing process, and limited consideration of its policy disagreement with the antitrust guidelines to step three of the sentencing process. See, e.g., United States v. Shannon, 414 F.3d 921, 923-24 (8th Cir.2005) (discussing the three-step sentencing process followed by district courts in the post-Booker sentencing regime).[7] Importantly, the *1040 district court’s variance from the advisory guidelines range was based only in part on its general policy disagreement with the antitrust guidelines. More significantly (as we discussed above), the district court’s sentencing decision was primarily based on how the antitrust guideline applied to VandeBrake in particular, as well as the district court’s consideration of individual characteristics of this defendant untethered to the antitrust guideline (i.e., VandeBrake’s lack of remorse). As such, the final sentence in this case would have reflected a mix of the comparative institutional abilities of both the trial court and the Sentencing Commission, even assuming the district court’s policy disagreement with § 2R1.1 touched upon some aspect of the guideline based on research and empirical data.
In such a situation, when reviewing one final, indivisible sentencing decision which reflects a mix of the comparative institutional abilities of both the trial court and the Commission, we would follow the lead of at least one member of the Supreme Court who would still categorize Kimbrough’s closer review as falling within the “framework for evaluating ‘reasonableness.’ ” Pepper v. United States, — U.S. -, 131 S.Ct. 1229, 1254, 179 L.Ed.2d 196 (2011) (Breyer, J., concurring). Under such a framework, while appellate courts would review those aspects of a sentencing decision “more closely when they rest upon disagreement with Guidelines policy,” and “with greater deference when they rest upon case-specific circumstances[,]” our overall review would still be under the rubric of “reasonableness.” Id. at 1255.
In this case, the district court’s policy disagreement was based in large part upon case-specific circumstances, and the end result was an antitrust sentence more comparable to a fraud sentence based upon a similar amount of loss. As such, the district court’s final sentence seems eminently consistent with the very rationale used by the dissent to attack it. See Post at 1046 (“Since ‘[t]he Commission ha[d] long recognized the similarity of antitrust offenses to sophisticated frauds,’ the Commission amended § 2R1.1 to ensure ‘that penalties for antitrust offenses will be coextensive with those for sophisticated frauds sentenced under § 2B1.1.’ ”) (quoting U.S.S.G. app. C, amend. 678).
In sum, we find no basis for concluding the final sentence is substantively unreasonable. The district court considered appropriate factors in varying from the guidelines, and adequately explained its sentence. See, e.g., United States v. Hill, 552 F.3d 686, 690-92 (8th Cir.2009) (affirming a sentence of fifty-one months (thirty months above the advisory guidelines range) where the district court adequately explained its sentence, noting the sentencing judge is in a “superior position” to evaluate the facts of any given case and judge their significance against the § 3353(a) factors) (internal quotation marks and citation omitted). Similarly, the district court considered appropriate factors in selecting the fine amount, and adequately explained its chosen amount. We find no basis for concluding the amount of the fine is substantively unreasonable.
Ill
We affirm the judgment of the district court.

. The Honorable Mark W. Bennett, United States District Judge for the Northern District of Iowa.

. For more information on the Antitrust Division’s Leniency Program, go to www.justice. gov/atr/public/criminal/leniency.htm.

. For a more extensive discussion and explanation of the three conspiracies and additional factual background involved in this case, see the district court's reported decision at United States v. VandeBrake, 771 F.Supp.2d 961, 967-82 (N.D.Iowa 2011).

. The district court considered:
VandeBrake’s income; earning capacity; financial resources; the burden on VandeBrake and his dependents; pecuniary loss inflicted on others as a result of the offense; whether restitution is ordered; the need to deprive VandeBrake of illegal gains; the expected costs of VandeBrake's imprisonment and supervised release; and the need to promote respect for the law, provide just punishment, and adequate deterrence.
Id. at 1011 (citing 18 U.S.C. § 3572(a)).

. Based on our conclusion that VandeBrake waived the right to challenge the district *1037 court’s non-acceptance of the binding plea agreement, we deny VandeBrake’s pending motion to enforce the binding plea agreement. In addition, VandeBrake filed a motion asking us to take judicial notice of a transcript in an unrelated case. Because that pending motion also relates to the same waived claim, we deny it as well.

. We are not willing to accept the dissent’s view that the district court's decision must be given "closer review,” however, because to whatever extent the volume of commerce gradations were actually based on empirical data (a point the dissent never explains), the Commission itself put so many qualifications on its assumption that it should be given little weight. See U.S.S.G. app. c. amend. 377 ("[T]he offense levels for antitrust offenses based on volume of commerce increase less rapidly than the offense levels for fraud, in part, because, on the average, the level of mark-up from an antitrust violation may tend to decline with the volume of commerce involved.”) (emphasis added).

. The three steps in the post-Booker sentencing process are: (1) "to determine the [initial] advisory guideline sentencing range,” (2) to determine "any appropriate departures [upward or downward] from the guidelines [,]” and (3) to decide whether "to vary from the advisory guideline range based on the factors set forth in § 3553(a), so long as such a variance is reasonable.” Shannon, 414 F.3d at 923.

. Since VandeBrake was sentenced in 2011, I assume that the single upward variance noted in this appendix represents VandeBrake's sentence.